## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-334 (MJD/TNL) |
| Plaintiff, | |
| | **ORDER** |
| v. | **&** |
| | **REPORT & RECOMMENDATION** |
| Willie Junior Cage, Sr., | |
| Defendant. | |

Garrett S. Fields, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Asa John Weston, Weston Law Office, LTD, 900 American Boulevard East, Suite 124, Bloomington, MN 55420; and Justin A. Bruntjen, Gerald Miller P.A., 2915 Wayzata Boulevard, Minneapolis, MN 55305 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the Government's Motion for Discovery Pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, 12.3, and 26.2, ECF No. 27, and Defendant Willie Junior Cage, Sr.'s Motion for a "*Franks*" Hearing, ECF No. 37; Motion for Suppression of Evidence, ECF No. 38; Motion to Identify Confidential Informant(s), ECF No. 39; and Motion for Discovery and *Brady*/*Giglio* Materials, ECF No. 40.

A hearing was held on February 14, 2024. ECF No. 49. Garrett S. Fields appeared on behalf of the Government. Asa John Weston and Justin A. Bruntjen appeared on behalf of Defendant.

1

## II. BACKGROUND

The investigation of this matter was based on several tracking and search warrants authorized by state district court judges.

### A. First & Second Tahoe Tracking Warrants

In early March 2023, law enforcement sought and obtained a tracking warrant for a Chevrolet Tahoe bearing a specified license plate. *See generally* Def. Ex. 1, ECF No. 41-1 at 1-8. The application explained that law enforcement had been in contact with a confidential informant[1] "for the past three months." Def. Ex. 1, ECF No. 41-1 at 3. The confidential informant had "extensive knowledge of street gangs, firearms, and narcotics distribution." Def. Ex. 1, ECF No. 41-1 at 3. In the past, the confidential informant had "provided the names, phone numbers and addresses of individuals involved in narcotics sales and weapons possession," information which had "been corroborated by [law enforcement] and found to be true and accurate." Def. Ex. 1, ECF No. 41-1 at 3.

The application detailed that, in February, the confidential informant told law enforcement about an individual he knew as "Kill" who was "involved in the distribution of cocaine." Def. Ex. 1, ECF No. 41-1 at 3. The confidential informant did not know Kill's "full identity." Def. Ex. 1, ECF No. 41-1 at 3. The confidential informant stated that Kill had delivered cocaine to another individual known to the informant "on three occasions in the recent past" and the informant had been present during the transactions. Def. Ex. 1, ECF No. 41-1 at 3. The confidential informant stated that Kill was driving a

---

[1] For ease of discussion, the Court refers to the confidential informant using masculine pronouns regardless of the informant's true gender.

Chevrolet Tahoe with a specified license plate and was associated with an address on Third Street North in Minneapolis, Minnesota. The confidential informant did not believe that Kill resided at the Third Street address.

Through law enforcement databases, law enforcement learned that "Kill" was a moniker for Defendant and Defendant was linked to both the Third Street address and an address on Bren Road in Minnetonka, Minnesota. Law enforcement also learned that the Tahoe was registered to a woman at the Bren Road address and the woman was identified as Defendant's "spouse in jail management software." Def. Ex. 1, ECF No. 41-1 at 3. A review of Defendant's criminal history included a number of controlled-substance charges, including a conviction for "1st Degree Drugs" in 2017. Def. Ex. 1, ECF No. 41-1 at 3.

Among other things, the application explained that, based on training and experience, law enforcement knew that "individuals involved in narcotics trafficking make a concerted effort to reside at locations in an under the radar fashion to avoid detection from law enforcement"; "will . . . keep their illegal narcotics at those locations of residence that are not easily identified"; and often transport and conceal narcotics in vehicles. Def. Ex. 1, ECF No. 41-1 at 4. The application stated that it is believed that Defendant or someone else was using the Tahoe to distribute narcotics and that monitoring the location of the Tahoe would "lead to the discovery of potential co-conspirators and/or other locations where [Defendant] or others utilizing that vehicle may be residing or storing controlled substances." Def. Ex. 1, ECF No. 41-1 at 4.

The First Tahoe Tracking Warrant permitted the vehicle to be tracked for 60 days.

3

Def. Ex. 1, ECF No. 41-1 at 6.

Towards the end of April, law enforcement sought and obtained a second tracking warrant for the Tahoe that extended the First Tahoe Tracking Warrant. *See generally* Def. Ex. 2, ECF No. 41-1 at 9-16. The application in support of the Second Tahoe Tracking Warrant reiterated the same factual basis as the First Tahoe Tracking Warrant. *See* Def. Ex. 2, ECF No. 41-1 at 11-12. In addition, the application for the Second Tahoe Tracking Warrant noted that the First Tahoe Tracking Warrant had been obtained; the tracking device was installed in early March; and electronic surveillance showed that the Tahoe "was at an auto body shop and then not used from [March 20] through [April 12, 2023]." Def. Ex. 2, ECF No. 41-1 at 12. The application further stated that law enforcement had "identified one additional residence to date"[2] associated with Defendant and the Tahoe and that "staff at that residence indicated suspicion of [Defendant] and narcotics dealing." Def. Ex. 2, ECF No. 41-1 at 12.

The Second Tahoe Tracking Warrant permitted the vehicle to be tracked for another 60 days. Def. Ex. 2, ECF No. 41-1 at 14.

**B. Residence Warrants**

The following day, on April 27, 2023, law enforcement obtained warrants to search the Bren Road residence and a residence on Portland Avenue in Minneapolis, Minnesota. *See generally* Def. Exs. 3-4, ECF No. 41-1 at 17-39. These warrants were executed on May 3, 2023, approximately one week later. Def. Ex. 3, ECF No. 41-1 at 28; Def. Ex. 4, ECF No. 41-1 at 39.

---

[2] This residence is not identified or described.

### 1. Bren Road Warrant

The application for the Bren Road Warrant repeated the information from the First Tahoe Tracking Warrant. Def. Ex. 3, ECF No. 24-1 at 19-20. The application additionally stated that law enforcement had spoken with management at the Bren Road residence and learned Defendant and his wife were listed on the lease. Law enforcement also observed the Tahoe "parked in the underground garage" of the Bren Road residence. Def. Ex. 3, ECF No. 41-1 at 20. The application additionally explained how law enforcement had located the Tahoe at the Bred Road residence and another residence associated with Defendant through electronic surveillance. The application for the Bren Road Warrant further described other things connecting Defendant and his wife to the Bren Road residence, including a 2021 child protection report identifying them as being associated with that address and vehicle and license information for Defendant's wife associating her with that address.

Additionally, law enforcement had maintained regular, weekly communication with the confidential informant, who reported that "sources known to the [informant] continue to communicate with 'Kill' (believed to be [Defendant]) about ongoing narcotics transactions specific to the sale of cocaine." Def. Ex. 3, ECF No. 41-1 at 20.

Further, within the past 72 hours of the application, law enforcement had also utilized an investigator and his canine partner, Molly, to "conduct[] an open-air search of the second-floor hallway which included the door of [the Bren Road residence]."[3] Def. Ex. 3, ECF No. 41-1 at 20-21. The application stated that Molly "is certified in narcotics

---

[3] *See infra* Section IV.B.4.

detection" for methamphetamine, cocaine, heroin, MDMA, and marijuana-THC; was current in her certifications; recertifies annually; and participates in ongoing weekly training.  Def. Ex. 3, ECF No. 41-1 at 21.  The application explained that Molly "alerted to the presence of narcotic odor coming from the area around the door of [the Bren Road residence]."  Def. Ex. 3, ECF No. 41-1 at 21.

Among other things, the Bren Road Warrant authorized law enforcement to search for controlled substances, including but not limited to cocaine, and related items.  Def. Ex. 3, ECF No. 41-1 at 25.  During this search, law enforcement recovered a key fob from Defendant's pocket matching the fob for the Portland Avenue residence and a large quantity of U.S. currency in a dresser drawer.  Def. Ex. 3, ECF No. 41-1 at 28.

### 2.  Portland Avenue Warrant

The application for the Portland Avenue Warrant likewise repeated the information from the First Tahoe Tracking Warrant.  Def. Ex. 4, ECF No. 41-1 at 32.  Like the Bren Road Warrant, this application also noted that law enforcement had maintained regular, weekly communication with the confidential informant, who reported that "sources known to the [informant] continue to communicate with 'Kill' (believed to be [Defendant]) about ongoing narcotics transactions specific to the sale of cocaine."  Def. Ex. 4, ECF No. 41-1 at 32.

As to the Portland Avenue residence itself, the application stated that law enforcement had been "monitor[ing] electronic surveillance."  Def. Ex. 4, ECF No. 41-1 at 32.  The application explained that, "[d]uring the second week of April 2023," law enforcement identified the Portland Avenue residence and located the Tahoe parked in

the underground garage.  Def. Ex. 4, ECF No. 41-1 at 32.  Law enforcement "spoke with apartment staff and learned [the Portland Avenue residence] is leased to 'Willie Cages' and . . . was rented in January 2023."  Def. Ex. 4, ECF No. 41-1 at 32.  Apartment staff also told law enforcement "that they suspected criminal activity related to narcotics trafficking occurring in [the Portland Avenue residence]," specifically "people coming and going, staying for only short periods of time."  Def. Ex. 4, ECF No. 41-1 at 32. Apartment staff "did not believe [Defendant] to stay at the apartment for extended periods of time either."  Def. Ex. 4, ECF No. 41-1 at 32.

Similar to the Bren Road residence, law enforcement also enlisted Molly and her handler to "conduct[] an open-air search of the fourth-floor hallway which included the door of [the Portland Avenue residence]."[4]  Def. Ex. 4, ECF No. 41-1 at 32.  The application in support of the Portland Avenue residence likewise detailed Molly's certifications and ongoing training and stated that she "alerted to the presence of narcotic odor coming from the area around the door of [the Portland Avenue residence]."  Def. Ex. 4, ECF No. 41-1 at 32.

Among other things, the Portland Avenue Warrant authorized law enforcement to search for controlled substances, including but not limited to cocaine, and related items. Def. Ex. 4, ECF No. 41-1 at 36.  Law enforcement recovered cocaine ("[b]ags of cocaine" and "[f]our kilos of cocaine"), a large amount of U.S. currency, narcotics packaging, a digital scale, a bill counter, and documents related to Defendant, among other things.  Def. Ex. 4, ECF No. 41-1 at 39.

---

[4] *See infra* Section IV.B.4.

### C. Traverse Tracking Warrant

In early September 2023, law enforcement sought and obtained a tracking warrant for a Chevrolet Traverse bearing a specified license plate. *See generally* Def. Ex. 5, ECF No. 41-1 at 40-47.

The application in support of the Traverse Tracking Warrant explained that law enforcement had been working with a confidential informant "for the past eight months"; the informant had "an extensive knowledge of street gangs, firearms, and narcotics distribution"; the informant had previously "provided names, phone numbers and addresses of individuals involved in narcotics sales and weapons possession"; and information provided by the informant had "been corroborated . . . and . . . found to be true and accurate." Def. Ex. 5, ECF No. 41-1 at 42.

The application discussed the search warrants executed on the Bren Road and Portland Avenue residences. The application explained that both residences were identified as personal residences for Defendant and his wife. The application stated that "approximately 10 pounds of field test positive cocaine, $28,100 in U.S. currency, narcotics packaging, digital scale, money counter, and documentation for [Defendant]" were seized from the Portland Avenue residence and $23,060 was seized from the Bren Road residence. Def. Ex. 5, ECF No. 41-1 at 42. The application stated that Defendant was at the Bren Road residence at the time the warrant was executed and arrested. At the time of his arrest, a key fob for the Portland Avenue residence was recovered from Defendant's pants pocket. The application noted that, after Defendant was charged in state court "for 1st Degree Controlled Substance," the case was adopted by the United

8

States Attorney's Office.  Def. Ex. 5, ECF No. 41-1 at 42.

The application in support of the Traverse Tracking Warrant noted that, following the execution of the Bren Road and Portland Avenue Warrants, law enforcement observed Defendant driving a Chevrolet Traverse with a specified license plate, which was registered to his wife.

The application explained that, in August, law enforcement "learned from the [confidential informant] that the [informant] learned [Defendant] was out dealing quantities of cocaine again."  Def. Ex. 5, ECF No. 41-1 at 42.  The confidential informant told law enforcement that Defendant "was seen driving a smaller Chevrolet SUV described as being smaller than a Chevrolet Tahoe."  Def. Ex. 5, ECF No. 41-1 at 42.

Additionally, the application in support of the Traverse Tracking Warrant stated that law enforcement learned that Defendant and his wife had been evicted from the Bren Road residence and, based on information in a law enforcement database, Defendant's wife had leased a residence in Maple Grove, Minnesota.  Law enforcement databases also linked Defendant to the Maple Grove residence as of the end of August.  The application explained that law enforcement met with apartment staff at the Maple Grove residence and confirmed Defendant's wife was listed on the lease.  While Defendant was not listed on the lease, law enforcement learned that "he has been observed at the apartment on several occasions."  Def. Ex. 5, ECF No. 41-1 at 43.  Law enforcement also observed the Traverse in the parking lot and believed Defendant was driving the vehicle.

Like the First Tahoe Tracking Warrant, the application in support of the Traverse Tracking Warrant noted that a review of Defendant's criminal history included a number

of controlled-substance charges, including a conviction for "1st Degree Drugs" in 2017. Def. Ex. 5, ECF No. 41-1 at 43. This application likewise explained that, based on training and experience, law enforcement knew that "individuals involved in narcotics trafficking make a concerted effort to reside at locations in an under the radar fashion to avoid detection from law enforcement"; "will . . . keep their illegal narcotics at those locations of residence that are not easily identified"; and often transport and conceal narcotics in vehicles. Def. Ex. 5, ECF No. 41-1 at 43.

The application stated that it is believed that Defendant or another was using the Traverse to distribute narcotics and that monitoring the location of the Traverse would "lead to the discovery of potential co-conspirators and/or other locations where [Defendant] or others utilizing that vehicle may be residing or storing controlled substances." Def. Ex. 5, ECF No. 41-1 at 43.

Like the First and Second Tahoe Tracking Warrants, the Traverse Tracking Warrant permitted the vehicle to be tracked for 60 days. Def. Ex. 5, ECF No. 41-1 at 45.

**D. Third Tahoe Tracking Warrant**

Two weeks later, law enforcement sought and obtained a third tracking warrant for the Chevrolet Tahoe. *See generally* Def. Ex. 6, ECF No. 41-1 at 48-56.

The application in support of the Third Tahoe Tracking Warrant reiterated the information from the Traverse Tracking Warrant and explained that law enforcement had conducted electronic surveillance of the Traverse and found it parked at the Minneapolis-St. Paul International Airport as of September 10. The application stated that law enforcement "learned [Defendant] traveled to Fort Myers, Florida on a one-way ticket"

10

and the "Traverse remains parked in the parking ramp."  Def. Ex. 6, ECF No. 44-1 at 51.

The application explained that, within the last 72 hours, law enforcement "learned from the [confidential informant] that [Defendant] is in Minneapolis and was observed by the [informant]."  Def. Ex. 6, ECF No. 44-1 at 51.  The confidential informant "indicated that [Defendant] was in possession of a quantity of cocaine as being represented for sale."  Def. Ex. 6, ECF No. 44-1 at 51.  The application stated that neither law enforcement nor the confidential informant knew what vehicle Defendant was driving.

The application in support of the Third Tahoe Tracking Warrant went on to describe how law enforcement had previously obtained authorization to track a Tahoe registered to Defendant's wife that law enforcement knew Defendant to use.  The application stated how, at that time, the Tahoe bore a particular license plate, but now presently displayed a different specified license plate.[5]  The application explained that the Maple Grove residence has a parking stall in the underground garage, and apartment staff have "heard [Defendant's wife] and her kids in the apartment and . . . noticed the Tahoe to not be on the premises."  Def. Ex. 6, ECF No. 41-1 at 51.  The application stated that law enforcement "believes that [Defendant] may be utilizing the . . . Tahoe" with the current specified license plate.  Def. Ex. 6, ECF No. 41-1 at 51.

The application stated that monitoring the location of the Tahoe would "lead to the discovery of potential co-conspirators and/or other locations where [Defendant] or others utilizing that vehicle may be residing or storing controlled substances."  Def. Ex. 6, ECF

---

[5] There does not appear to be any dispute that the Tahoe in question was the same vehicle.  *See* Def. Mem. in Supp. at 7 n.1 ("Although there are two different MN License tags listed in the Chevrolet Tahoe warrants, they are the same vehicle, with the same VIN number."), ECF No. 41.  *Compare* Def. Ex. 1, ECF No. 41-1 at 2; Def. Ex. 2, ECF No. 41-1 at 10, *with* Def. Ex. 6, ECF No. 41-1 at 49.

No. 41-1 at 52.

Like the First and Second Tahoe Tracking Warrants, the Third Tahoe Tracking Warrant permitted the vehicle to be tracked for 60 days.  Def. Ex. 6, ECF No. 41-1 at 54.

### E.  Storage Unit Warrant

Around the beginning of October 2023, law enforcement sought and obtained a search warrant for a storage unit.  *See generally* Def. Ex. 7, ECF No. 41-1 at 57-66.

Like the Third Tahoe Tracking Warrant, the application in support of the Storage Unit Warrant reiterated the information from the Traverse Tracking Warrant.  The application in support of the Storage Unit Warrant also described how Defendant was arrested on September 9 while he was the sole occupant of the Traverse.  The application explained that a search of the Traverse revealed "a large quantity of U.S. currency located in the center console."  Def. Ex. 7, ECF No. 41-1 at 60.  "The currency was bound by rubber bands and was in multiple stacks of varying denominations consistent with [law enforcement's] training and experience of persons involved in narcotics distribution."  Def. Ex. 7, ECF No. 41-1 at 60.

The search also revealed "two hex style key box keys."  Def. Ex. 7, ECF No. 41-1 at 60.  The application in support of the Storage Unit Warrant explained that, through prior electronic surveillance, law enforcement was aware that Defendant had accessed a storage facility located in Minneapolis, Minnesota, and the "key style matches the same set of keys purchased at the . . . facility."  Def. Ex. 7, ECF No. 41-1 at 60.  Through an administrative subpoena, law enforcement was able to access rental records for the storage facility and learned that a particular unit was rented to "Willie Cage" and

purchased in June through October 2023.  Def. Ex. 7, ECF No. 41-1 at 61.

In addition, the application in support of the Storage Unit Warrant described how law enforcement had enlisted another law enforcement officer and his canine partner, Buck, to conduct sniffs of the storage unit and of the currency recovered from the Traverse.  Buck is "certified in narcotics detection," but "is not certified in THC-Marijuana odor."  Def. Ex. 7, ECF No. 41-1 at 61.  At the storage facility, "Buck conducted a sniff of several storage units which included [Defendant's storage unit]."  Def. Ex. 7, ECF No. 41-1 at 61.  "Buck alerted to the presence of narcotic odor coming from the area around the door of [Defendant's storage unit]."  Def. Ex. 7, ECF No. 41-1 at 61.  Buck also "conducted a blind search of three paper bags," one of which contained the U.S. currency recovered from the Traverse.  Def. Ex. 7, ECF No. 41-1 at 61.  "Buck only alerted to the bag that contained the U.S. currency recovered from [Defendant's] vehicle."  Def. Ex. 7, ECF No. 41-1 at 61.

Among other things, the application in support of the Storage Unit Warrant explained that, based on law enforcement's training and experience, "it is common for suspects involved in narcotics distribution activities to hide illegal narcotics . . . in vehicles and garages" and that "[t]his is done in [an] effort to conceal the illicit items from police and allows suspects to quickly access the items if they are outside the residence."  Def. Ex. 7, ECF No. 41-1 at 62.  Law enforcement believed the storage unit rented to Defendant was "being utilized to store or distribute narcotics."  Def. Ex. 7, ECF No. 41-1 at 62.

Among other things, law enforcement recovered a digital scale, "[m]ultiple bags

of suspected cocaine," and documentation related to Defendant from the storage unit. Def. Ex. 7, ECF No. 41-1 at 66.

### III. GOVERNMENT'S DISCOVERY MOTION

The Government's motion seeks discovery available under Federal Rules of Criminal Procedure 12.1, 12.2, 12.3, and 26.2. *See generally* ECF No. 27. At the hearing, Defendant had no objection to the Government's motion. The Government's motion is granted.

### IV. DEFENDANT'S MOTION FOR A *FRANKS* HEARING[6]

Defendant moves for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1974), asserting that the warrants contained material omissions or misstatements of fact. *See generally* ECF No. 37. In connection with this motion, Defendant offered and the Court received: Exhibit 1, the First Tahoe Tracking Warrant, ECF No. 41-1 at 1-8; Exhibit 2, the Second Tahoe Tracking Warrant, ECF No. 41-1 at 9-16; Exhibit 3, the Bren Road Warrant, ECF No. 41-1 at 17-28; Exhibit 4, the Portland Avenue Warrant, ECF No. 41-1 at 29-39; Exhibit 5, the Traverse Tracking Warrant, ECF No. 41-1 at 40-47; Exhibit 6, the Third Tahoe Tracking Warrant, ECF No. 41-1 at 48-56; Exhibit 7, the Storage Unit Warrant, ECF No. 41-1 at 57-66; Exhibit 8, an affidavit from his wife, ECF No. 41-1 at 67-68; Exhibit 9, two reports related to the deployment of Buck at the storage facility and during the blind search, ECF No. 41-1 at 69-71; Exhibit 10, his own affidavit and accompanying exhibits related to travel between September 10 and October 2, 2023,

---

[6] *See, e.g.*, *United States v. Mays*, No. 19-cr-75 (ECT/HB), 2019 WL 4565636, at *3-4 (D. Minn. Sept. 20, 2019) (request for *Franks* hearing non-dispositive issue); *see also, e.g.*, *United States v. Green*, No. 19-cr-103(3) (MJD/ECW), 2020 WL 6337705, at *2 (D. Minn. Oct. 29, 2020).

ECF No. 41-1 at 72-95; Exhibit 11, the transcript from his October 12, 2023 preliminary/detention hearing, ECF No. 41-1 at 96-135; Exhibit 12, *State v. Trapp*, No. A09-2177, 2010 WL 3396882 (Minn. Ct. App. Aug. 31, 2010), ECF No. 41-1 at 136-44; Exhibit 13, the training/deployment log for Molly; and Exhibit 14, a Delta flight receipt for a late evening flight from Las Vegas, Nevada, to Minnesota, departing on October 1 and arriving on October 2, 2023.[7]

### A. Legal Standard

Under *Franks*,

> [a] defendant is entitled to a hearing to determine the veracity of a search warrant affidavit if he or she can make a substantial preliminary showing that a false statement was included in the affidavit (or that relevant information was omitted from it) intentionally or recklessly, and that the allegedly false statement was necessary to a finding of probable cause or that the alleged omission would have made it impossible to find probable cause.

*United States v. Mathison*, 157 F.3d 541, 547-48 (8th Cir. 1998) (citing 438 U.S. at 155-56); *see also, e.g.*, *United States v. Patterson*, 68 F.4th 402, 414 (8th Cir. 2023). "[A] misstatement must be the product 'of deliberate falsehood or of reckless disregard for the truth. . . . Allegations of negligence or innocent mistake are insufficient.'" *United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007) (alteration in original) (quoting *Franks*, 438 U.S. at 171). "[R]ecklessness may be inferred from the fact of omission of

---

[7] Defendant Exhibits 13 and 14 were received at the hearing. At the hearing, the Government offered and the Court received without objection from Defendant, Government Exhibit 1, which includes reports related to the execution of the Bren Road and Portland Avenue Warrants. Although received, the Court has not considered Government Exhibit 1 in analyzing Defendant's request for a *Franks* hearing. *See United States v. Arnold*, 725 F.3d 896, 900 n.3 (8th Cir. 2013). Indeed, the Government previously indicated it intended to call a witness regarding the canine sniffs at the Bren Road and Portland Avenue residences, Defendant objected, and that objection was sustained. *See, e.g.*, Gov't Resp. at 32, ECF No. 42; *see generally* ECF Nos. 43-48.

information from an affidavit when the material omitted would have been 'clearly critical' to the finding of probable cause." *Id.* (quotation omitted); *see also, e.g.*, *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011). "In determining if an affiant's statements were made with reckless disregard for the truth, the test is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *McIntyre*, 646 F.3d at 1114 (quotation omitted); *see also, e.g.*, *United States v. Hansen*, 27 F.4th 634, 638 (8th Cir. 2022).

"The requirement of a substantial preliminary showing is not lightly met." *Mathison*, 157 F.3d at 548 (quotation omitted); *see also, e.g.*, *United States v. Randle*, 39 F.4th 533, 537 (8th Cir. 2022). "A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *Mathison*, 157 F.3d at 548; *see also Franks*, 438 U.S. at 171.

Further still, even if such a showing is made, "and, if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72 (footnote omitted).

### B. Alleged Misstatements & Omissions

#### 1. All Warrants: Informant's Circumstances

First, Defendant asserts that each of the applications contained material omissions regarding "the circumstances under which the confidential informant provided [the]

information to law enforcement." Def. Mem. in Supp. at 10. Defendant asserts the statement in the applications that the confidential informant "has an extensive knowledge of street gangs, firearms, and narcotics distribution" "would lead any reasonable person to believe that the [informant] was involved in the criminal underworld" and therefore the circumstances of the informant's "involvement with law enforcement is absolutely essential to the signing judge or magistrate's personal assessment of the informant's credibility." Def. Mem. in Supp. at 11-12.

"When an affidavit in support of a search warrant is based upon information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (quotation omitted); *accord United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019). "The key inquiry in such cases is whether the information is reliable." *Faulkner*, 826 F.3d at 1145; *see also, e.g.*, *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993) ("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable."). "Such reliability can be established through independent corroboration or the informant's track record of providing trustworthy information." *Faulkner*, 826 F.3d at 1144; *see also, e.g.*, *Petruk*, 929 F.3d at 959; *Williams*, 10 F.3d at 593.

First, each of the warrants noted that (1) the confidential informant has "an extensive knowledge of street gangs, firearms, and narcotics distribution"; (2) the informant has a history of providing "names, phone numbers and addresses of individuals

involved in narcotics sales and weapons possession" to law enforcement; and (3) such information "has been corroborated by [law enforcement] and found to be true and accurate."  Def. Ex. 1, ECF No. 41-1 at 3; *see also* Def. Ex. 2, ECF No. 41-1 at 3; Def. Ex. 3, ECF No. 41-1 at 19; Def. Ex. 4, ECF No. 41-1 at 31; Def. Ex. 5, ECF No. 41-1 at 42; Def. Ex. 6, ECF No. 41-1 at 50; Def. Ex. 7, ECF No. 41-1 at 59.  "The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information."  *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998); *accord United States v. Mayweather*, 993 F.3d 1035, 1044 (8th Cir. 2021).

Second, each of the warrants discussed efforts taken by law enforcement to corroborate information provided by the confidential informant, including, for example, linking the "Kill" moniker to Defendant, corroborating the Third Street address as an addressed associated with Defendant, and learning the Tahoe with the specified license plate was registered to Defendant's wife, Def. Ex. 1, ECF No. 41-1 at 3; Def. Ex. 2, ECF No. 41-1 at 11; Def. Ex. 3, ECF No. 41-1 at 19-10; Def. Ex. 4, ECF No. 41-1 at 31-32, as well as describing how law enforcement had also observed Defendant driving a smaller Chevrolet SUV and that vehicle was registered to Defendant's wife, Def. Ex. 5, ECF No. 41-1 at 42; Def. Ex. 6, ECF No. 41-1 at 52; Def. Ex. 7, ECF No. 41-1 at 59-60.  "It is well established that even the corroboration of minor, innocent details can suffice to establish probable cause."  *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013) (quotation omitted); *see Faulkner*, 826 F.3d at 1145 ("The corroborated information established that the [confidential reliable informant] was providing accurate information

18

about verifiable details, and the fact that those corroborated details were not about criminal activity does not subtract from the probable cause analysis.").  And, "[i]f information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Williams*, 10 F.3d at 593; *accord Keys*, 721 F.3d at 518; *see also United States v. Crissler*, 539 F.3d 831, 834 (8th Cir. 2008).

Third, "[o]missions of fact in a supporting affidavit do not constitute misrepresentations unless they cast doubt on the existence of probable cause." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010).  "[T]ipsters often provide information in the hopes of obtaining leniency with respect to their own situation and that does not necessarily mean they are unreliable." *United States v. Gabrio*, 295 F.3d 880, 884 (8th Cir. 2002); *see Crissler*, 539 F.3d at 834.  Given the confidential informant's history of providing trustworthy information and the corroboration by law enforcement of information provided by the informant, Defendant has not shown that the specific circumstances under which the informant came to provide information to law enforcement were necessary to a finding of probable cause.  *See United States v. Humphreys*, 982 F.2d 254, 258-59 (8th Cir. 1992) ("Humphreys fails to understand that, while *he* may believe that the informants lacked credibility, where the informants' information is at least partially corroborated, attacks upon credibility and reliability are not crucial to the finding of probable cause."); *see also United States v. Riaski*, 91 F.4th 933, 937 (8th Cir. 2024) ("omission of the details and existence of the agreement between

19

[law enforcement] and the [confidential informant] did not render [the] affidavit misleading"); *Williams*, 477 F.3d at 558-59 (without more, omission of confidential informant's agreement with law enforcement did "not materially change [informant's] apparent reliability or otherwise render the warrant application misleading").

### 2. Residence[8] Warrants: Defendant Not Observed Driving the Tahoe

Defendant next asserts that the Residence Warrants contained a material omission regarding his connection to the Tahoe, namely, that he was not observed driving the vehicle. Defendant proffers the affidavit of his wife, who states that she is the owner of the Tahoe; uses the vehicle to go to work, pick up her children, and run errands; and estimates that Defendant drove the vehicle on two occasions between February 1 and May 3, 2023. Def. Ex. 8, ECF No. 41-1 at 68.

Each warrant explained how the confidential informant relayed to law enforcement that Defendant had been driving the Tahoe to narcotics transactions, law enforcement corroborated that the Tahoe was registered to Defendant's wife, and law enforcement had been monitoring electronic surveillance. Def. Ex. 4, ECF No. 41-1 at 31-32; Def. Ex. 3, ECF No. 41-1 at 19-20. As to the Portland Avenue Warrant, the application explained that the Portland Avenue residence had been identified in the course of the electronic surveillance; the Tahoe was observed in the underground parking garage of the Portland Avenue residence; and apartment staff told law enforcement that the Portland Avenue residence was leased to "Willie Cages." Def. Ex. 4, ECF No. 41-1

---

[8] Although first identified as an omission in connection with the Portland Avenue Warrant, Def. Mem. in Supp. at 10, Defendant appears to be arguing the omission he was not observed driving the Tahoe applies to both the Portland Avenue and the Bren Road Warrants, Def. Mem. in Supp. at 12-13.

at 32. As to the Bren Road Warrant, the application explained that the Bren Road residence was linked to Defendant in law enforcement databases; the Tahoe was registered to Defendant's wife at the Bren Road residence; apartment staff told law enforcement that Defendant and his wife were listed on the lease for the Bren Road residence; the Tahoe was observed in the underground parking garage of the Bred Road residence; a child-protection report listed Defendant and his wife as being associated with the Bren Road residence; and vehicle and driver's license information for Defendant's wife listed the Bren Road residence. Def. Ex. 3, ECF No. 41-1 at 20.

As an initial matter, neither the Portland Avenue Warrant nor the Bren Road Warrant "omits the fact that law enforcement only saw the Tahoe on one occasion." Def. Mem. in Supp. at 12-13. Each application described how law enforcement observed the Tahoe in the respective underground parking garages on one occasion. *Cf.* Def. Mem. in Supp. at 41 ("Officers claim to have seen the Tahoe in the underground parage garage at Portland Ave on one occasion . . . ."). In any event, probable cause requires "a nexus between the evidence to be seized and the place to be searched, considering the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Schave*, 55 F.4th 671, 676 (8th Cir. 2022) (quotation omitted). "As a practical and common-sense standard, probable cause leaves plenty of room to draw reasonable inferences from less-than-perfect evidence." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (quotation and footnote omitted). It "is about fair probabilities, not near certainties." *Id.* (quotation omitted). Given the amount of information connecting the Tahoe and Defendant to the Portland Avenue and Bren Road residences, the omission of

21

the fact that Defendant was not observed by law enforcement to be driving the Tahoe during the time of the Portland Avenue and Bren Road Warrants does not cast doubt on the nexus between Defendant and these locations.

### 3. Portland Avenue Warrant: Defendant Not Observed at the Portland Avenue Residence

Similarly, Defendant asserts that the application in support of the Portland Avenue Warrant contained a material omission in that it did not state that he had not been observed by law enforcement at the Portland Avenue residence.  Defendant asserts that law enforcement "claim[s] to have seen the Tahoe in the underground parking garage at [the Portland Avenue residence] on one occasion, but have never stated that Defendant . . . was observed there, nor do they have video surveillance of him entering or exiting the building . . . ."  Def. Mem. in Supp. at 13.  Defendant asserts that "[t]he fact that the target of a drug trafficking investigation was never actually observed in the place to be searched is very relevant to a signing judge or magistrate's evaluation of the warrant application."  Def. Mem. in Supp. at 13.

This argument likewise goes to the nexus between Defendant and the Portland Avenue residence.  In addition to the information just discussed establishing a nexus between Defendant and the Portland Avenue residence, *see supra* Section IV.B.2, the application in support of the Portland Avenue Warrant stated that apartment "[s]taff did not believe [Defendant] to stay at the apartment for extended periods of time" and "suspected criminal activity related to narcotics trafficking" taking place in the Portland Avenue residence as "people [were] coming and going, staying for only short periods of

time." Def. Ex. 4, ECF No. 41-1 at 32. Further, the application stated that law enforcement "learned that the apartment does not have hallway cameras installed." Def. Ex. 4, ECF No. 41-1 at 32.

Considering the totality of the information linking Defendant to the Portland Avenue residence (including electronic and physical surveillance of the Tahoe and the lease documentation), the information received from apartment staff regarding Defendant's habits, and the absence of internal hallway cameras, the omission of the fact that law enforcement did not personally observe Defendant entering or exiting the Portland Avenue residence does not cast doubt on the nexus between Defendant and this location.

### 4. Residence Warrants: Canine Sniffs

"Upon information and belief," Defendant asserts that the canine sniffs purportedly conducted by Molly at the Portland Avenue and Bren Road residences "never happened." Def. Mem. in Supp. at 15. In support of his contention, Defendant asserts that no body-worn camera footage or reports were produced regarding these sniffs whereas reports were produced for Buck's sniffs, *see generally* Def. Ex. 9, ECF No. 41-1 at 69-71; a task force officer previously testified in this case that a report is typically written when a canine is deployed, Def. Ex. 11, ECF No. 41-1 at 25; and Molly's training/deployment log shows no entries within 72 hours of April 27, 2023,[9] the date of the applications to search the Portland Avenue and Bren Road residences, Def. Ex. 13. At the hearing, the Government stipulated that there were no reports for the sniffs

---

[9] The Court notes the entries are loosely but not entirely listed in chronological order.

conducted by Molly at the Portland Avenue and Bren Road residences.

The Court is hard pressed to conclude that Defendant has made the substantial preliminary showing needed to obtain a *Franks* hearing regarding the canine sniffs conducted by Molly at the Portland Avenue and Bren Road residences.  The Eighth Circuit Court of Appeals has repeatedly stated that this showing is "not easily met." *United States v. Blair*, 93 F.4th 1080, 1084 (8th Cir. 2024) (quotation omitted).  Merely because reports are typically generated when a canine is deployed does not necessarily mean that the absence of such a report is proof that the canine was not used.  The same could also be said for the absence of an entry on the canine's training/deployment log, though, within the confines of the limited information presently before the Court, this would seem to be a closer question.  The Court also recognizes that "clear proof . . . is not required at the stage at which the defendant is demonstrating an entitlement to an evidentiary hearing."  *Williams*, 477 F.3d at 558.

The Court need not and does not, however, decide whether Defendant has in fact made the substantial preliminary showing needed because, even assuming for sake of argument Defendant had made that showing, Defendant is not entitled to a *Franks* hearing unless the canine sniffs conducted at the Portland Avenue and Bren Road residences were necessary to a finding of probable cause.  *See Franks*, 438 U.S. at 155-56; *see, e.g.*, *United States v. Jones*, 74 F.4th 941, 948-49 (8th Cir. 2023).  The Court concludes that they were not.

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend IV; *see, e.g.*, *Mayweather*,

993 F.3d at 1040 ("The Fourth Amendment requires that warrants to search be supported by probable cause.").  "A supporting affidavit establishes probable cause to issue a search warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched."  *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quotation omitted); *see United States v. Skarda*, 845 F.3d 370, 376 (8th Cir. 2016) ("A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." (quotation omitted)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

"The court must make a 'common-sense decision' based on the totality of the circumstances set forth in the affidavit as to whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Skarda*, 845 F.3d at 376 (quoting *Gates*, 462 U.S. at 238); *see United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) ("The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." (quotation omitted)).  "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . [the Eighth Circuit has] also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'"  *Brackett*,

25

846 F.3d at 992 (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000));
*accord United States v. Augard*, 954 F.3d 1090, 1094 (8th Cir. 2020).  "Factors to
consider in determining whether a warrant application sufficiently links the items to be
seized with the place to be searched include 'the nature of the crime and the reasonable,
logical likelihood of finding useful evidence.'"  *United States v. Roberts*, 975 F.3d 709,
713 (8th Cir. 2020) (quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir.
2017)).

"When an issuing court relies solely on an affidavit to determine whether probable
cause exists, th[e reviewing] court only looks to the information found within the four
corners of the affidavit."  *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021)
(quotation omitted).  "Because reasonable minds may differ on whether a particular
search-warrant affidavit establishes probable cause, the issuing court's determination is
accorded great deference."  *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL
1100127, at *2 (D. Minn. Mar. 14, 2011), *report and recommendation adopted*, 2011 WL
1060981 (D. Minn. Mar. 23, 2011); *see also, e.g.*, *Evans*, 4 F.4th at 636; *Mayweather*,
993 F.3d at 1041; *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020);
*Faulkner*, 826 F.3d at 1144.

Turning first to the Portland Avenue Warrant, the application explained how, in
February, law enforcement received information from a confidential informant who had
provided reliable information in the past regarding an individual the informant knew as
"Kill" who was involved in the distribution of cocaine.  The confidential informant had
been present during three transactions in which Kill delivered cocaine to another

individual known to the informant and Kill was driving a Tahoe with a specified license plate.  The application explained how, among other things, law enforcement learned from law enforcement databases that "Kill" was a moniker for Defendant and the Tahoe in question was registered to Defendant's wife.  The application also discussed Defendant's criminal history, including charges and one conviction for controlled-substance crimes. The application then explained how, as a result of electronic surveillance, law enforcement identified the Portland Avenue residence and located the Tahoe parked in the underground garage.  The application further explained that apartment staff relayed that the Portland Avenue residence was rented to a "Willie Cages" and they "suspected criminal activity related to narcotics trafficking occurring" in the Portland Avenue residence as "people were coming and going, staying only for short periods of time." Def. Ex. 4, ECF No. 41-1 at 32.  Apartment staff also believed that Defendant did not "stay at the apartment for extended periods of time either."  Def. Ex. 4, ECF No. 41-1 at 32.   The application next explained how law enforcement had "maintained regular communication on a weekly basis with the [confidential informant]" and the informant had stated that "sources known to the [informant] continue to communicate with 'Kill' (believed to be [Defendant]) about ongoing narcotics transactions specific to the sale of cocaine."  Def. Ex. 4, ECF No. 41-1 at 32.  Again among other things, the application stated that based on law enforcement's "training and experience those individuals involved in narcotics trafficking make a concerted effort to reside at locations in an under the radar fashion to avoid detection from law enforcement" and "individuals involved in narcotics trafficking will also keep their illegal narcotics at those locations of residence

that are not easily identified."  Def. Ex. 4, ECF No. 41-1 at 33.

"[P]robable cause "'is not a high bar.'"  *James*, 3 F.4th at 1104 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  It "is a practical, factual, and nontechnical concept, dealing with probabilities."  *United States v. Anderson*, 339 F.3d 720, 723 (8th Cir. 2003) (quotation omitted); *see also Gates*, 462 U.S. at 238.  Here, even without the results of the canine sniff, there remained sufficient content in the application that could support a finding of probable cause.  The totality of the circumstances and the reasonable inferences therefrom—including but not limited to the reliability of the confidential informant; the connection between the Tahoe and illegal narcotics activity; the connection between Defendant and the Tahoe; the connection between the Tahoe and the Portland Avenue residence; and the connection between Defendant and the Portland Avenue residence—provided a substantial basis for concluding there was a fair probability that narcotics or evidence of criminal activity would be found at the Portland Avenue residence.

The application in support of the Bren Road Warrant similarly detailed the information learned from the confidential informant in February regarding Kill's involvement in the distribution of cocaine and use of the Tahoe; law enforcement investigative efforts linking the "Kill" moniker to Defendant and the Tahoe to Defendant's wife; and Defendant's criminal history.  Among other things, the application in support of the Bren Road Warrant additionally explained that Defendant was linked to the Bren Road residence in law enforcement databases; law enforcement learned from apartment staff that the Bren Road residence was leased to Defendant and his wife; the

Tahoe had been located in the underground parking garage of the Bren Road residence; and additional information connected Defendant and his wife to the Bren Road residence, including a child-protection report and vehicle and driver's license information for Defendant's wife.  The application then similarly explained how law enforcement had "maintained regular communication on a weekly basis with the [confidential informant]" and the informant had stated that "sources known to the [informant] continue to communicate with 'Kill' (believed to be [Defendant]) about ongoing narcotics transactions specific to the sale of cocaine."  Def. Ex. 3, ECF No. 41-1 at 20.  And, again among other things, the application stated that based on law enforcement's "training and experience those individuals involved in narcotics trafficking make a concerted effort to reside at locations in an under the radar fashion to avoid detection from law enforcement" and "individuals involved in narcotics trafficking will also keep their illegal narcotics at those locations of residence that are not easily identified."  Def. Ex. 4, ECF No. 41-1 at 33.  Here too, there remained sufficient content in the application that could support a finding of probable cause even without the results of the canine sniff.  The totality of the circumstances and the reasonable inferences therefrom—including but not limited to the reliability of the confidential informant; the connection between the Tahoe and illegal narcotics activity; the connection between Defendant and the Tahoe; the connection between the Tahoe and the Bren Road residence; and the connection between Defendant and the Bren Road residence—provided a substantial basis for concluding there was a fair probability that narcotics or evidence of criminal activity would be found at the Bren Road residence.

### 5.  Third Tahoe Tracking Warrant: Defendant's Whereabouts Within 72 Hours of September 20, 2023

Defendant asserts that law enforcement knew he was not in Minnesota at the time of the Third Tahoe Tracking Warrant and therefore the statement that, within the past 72 hours, the confidential informant had observed him in Minneapolis was "knowingly false."  Def. Mem. in Supp. at 15.  Defendant points out that law enforcement knew that the Traverse was parked in a ramp at the airport as of September 10; he had traveled to Florida on a one-way ticket; and the Traverse remained in the ramp as of September 20, the date of the application for the Third Tahoe Tracking Warrant.  Defendant has proffered his own affidavit, stating that he was not in Minnesota between September 11 and October 1, and traveled first to Florida and then to Nevada before returning to Minnesota on October 2.  Def. Ex. 10, ECF No. 41-1 at 73.  Defendant has also supplied related travel documentation, including flight receipts, a rental car receipt, and bank records showing transactions in Florida and Nevada during this time.  Def. Ex. 10, ECF No. 41-1 at 73-95; Def. Ex. 14.  At the hearing, Defendant argued that law enforcement could have easily confirmed any additional flights he took and when he took them.

It may have been that the confidential informant was mistaken that he had seen Defendant.  *See United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008).  But, Defendant has not made a substantial preliminary showing that law enforcement knew or should have known that the confidential informant was mistaken.  As the Government points out, law enforcement "had every reason to trust the information supplied by the [confidential] informant" given the informant's history of providing reliable information.

Gov't Resp. at 34. Moreover, it can hardly be said that law enforcement acted with reckless disregard for the truth when law enforcement expressly acknowledged in the application that Defendant had purchased a one-way ticket to Florida, the Traverse remained parked in the airport ramp since the time of his departure, and it was unknown what vehicle Defendant was driving, but then went on to explain *why notwithstanding those facts* law enforcement believed Defendant may be driving the Tahoe. Despite the Tahoe being registered to Defendant's wife, law enforcement was aware that Defendant used it and apartment staff had noticed that the Tahoe was not on the premises at times when Defendant's wife and her children were home at the apartment. Moreover, even if it could be said that law enforcement was "negligent in checking . . . the facts relevant to a probable-cause determination" by not further investigating Defendant's flight information, "[a]llegations of negligence . . . are insufficient." *Franks*, 438 U.S. at 170, 171.

### 6. Traverse & Third Tahoe Tracking Warrants: Conflicting Statements

Law enforcement applied for the Traverse Tracking Warrant on September 6, 2023. Def. Ex. 5, ECF No. 41-1 at 44. In the application, law enforcement stated that, in August, the confidential informant reported that Defendant "was seen driving a smaller Chevrolet SUV described as being smaller than a Chevrolet Tahoe." Def. Ex. 5, ECF No. 41-1 at 42. Two weeks later, law enforcement applied for the Third Tahoe Tracking Warrant. Def. Ex. 6, ECF No. 41-1 at 53. In the application, law enforcement repeated the confidential informant's August report regarding Defendant driving the smaller

Chevrolet SUV, noted that a tracking warrant had been obtained for the Traverse, and stated that the vehicle had been parked in the airport parking ramp since early September. Def. Ex. 6, ECF No. 41-1 at 50-51. Law enforcement then went on to state that, within the past 72 hours, the confidential informant reported that he had seen Defendant in Minnesota, but law enforcement did "not know what vehicle [Defendant] is driving, nor did the [informant]." Def. Ex. 6, ECF No. 41-1 at 51.

Defendant asserts that the statements that he was seen driving a smaller Chevrolet vehicle and that it was unknown what vehicle he was driving "cannot both be true." Def. Mem. in Supp. at 16. According to Defendant, "[f]earing that [he] had intentionally abandoned the car, [law enforcement] fabricated a story that [the confidential informant] no longer knew what car [Defendant] was driving." Def. Mem. in Supp. at 41. Defendant additionally asserts that a close reading of the statement in the Traverse Tracking Warrant shows that the confidential information did not personally observe him driving the Traverse but, rather, is relaying that someone else saw him driving the vehicle.

Beginning first with Defendant's contention that the confidential informant did not personally witness him driving the Traverse, there is no "rule excluding hearsay from the probable cause analysis." *Jones*, 74 F.4th at 949. With respect to the statements themselves, it is not the case that both of these statements cannot be true. As the Government points out, each application represents what was known to law enforcement at the time. It is not inconsistent to state that, at one point earlier in time, Defendant was driving a particular vehicle and, two weeks later, it was not known what vehicle he was

presently driving.  Defendant has failed to make a substantial preliminary showing that either statement was false or made with reckless disregard for the truth.  *See Mayweather*, 993 F.3d at 1043 ("A mere allegation standing alone is not enough." (quotation omitted)).

### C.  Defendant Not Entitled to a *Franks* Hearing

Having either failed to make the substantial preliminary showing or not shown that the challenged statements and omissions were necessary to a finding of probable cause, Defendant is not entitled to a *Franks* hearing on any of the warrants in this matter, and therefore his motion is denied.

### V. DEFENDANT'S MOTION TO SUPPRESS

Defendant has also moved to suppress the evidence obtained from each of the warrants.  *See generally* ECF No. 38.  "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting U.S. Const. amend. IV). "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

The Court will group and address the issues raised by Defendant as follows: (A) Tracking Warrants; (B) Residence Warrants; (C) Storage Unit Warrant.

### A.  Tracking Warrants

Defendant asserts that the First, Second, and Third Tahoe Tracking Warrants as well as the Traverse Tracking Warrant (collectively, "Tracking Warrants") are invalid because they did not comply with Rule 41 of the Federal Rules of Criminal Procedure

and none of the warrants was supported by probable cause.

### 1. Rule 41

The Tracking Warrants were all issued in state court and each permitted the subject vehicle to be tracked for a period not longer than 60 days.  Def. Ex. 1, ECF No. 41-1 at 6; Def. Ex. 2, ECF No. 41-1 at 10; Def. Ex. 5, ECF No. 41-1 at 45; Def. Ex. 6, ECF No. 41-1 at 54.

With respect to warrants for a tracking device, Rule 41 of the Federal Rules of Criminal Procedure states:

> A tracking-device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used. The time must not exceed 45 days from the date the warrant was issued. The court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each. The warrant must command the officer to:
> (i) complete any installation authorized by the warrant within a specified time no longer than 10 days;
> (ii) perform any installation authorized by the warrant during the daytime, unless the judge for good cause expressly authorizes installation at another time; and
> (iii) return the warrant to the judge designated in the warrant.

Fed. R. Crim. P. 41(e)(2)(C).

Defendant asserts that the Tracking Warrants failed to comply with Rule 41 because they permitted the vehicles to be tracked for longer than 45 days; they did not direct that installation be completed within 10 days or during the daytime; and "there is no evidence that the warrants were returned to the judge designated in the warrant."  Def. Mem. in Supp. at 22.   The Government does not dispute the non-compliance, but

contends that "[t]echnical violations . . . [of Rule 41] are not valid bases for suppression." Gov't Resp. at 16.

The Eighth Circuit has held that "Rule 41 applies exclusively to federal searches." *United Sates v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006); *see, e.g.*, *United States v. Schroeder*, 129 F.3d 439, 443 (8th Cir. 1997); *see also United States v. Salazar*, No. 16-cr-264 (SRN/HB), 2017 WL 1365110, at *7 (D. Minn. Mar. 23, 2017), *report and recommendation adopted*, 2017 WL 1365976 (D. Minn. Apr. 12, 2017). Defendant has put forth no argument as to why Rule 41 should apply to these state-issued warrants. But even if Rule 41 were applicable, "a Rule 41 violation amounts to a violation of the Fourth Amendment warranting exclusion 'only if a defendant is prejudiced or if reckless disregard of proper procedure is evident.'" *United States v. Welch*, 811 F.3d 275, 279 (8th Cir. 2016) (quoting *Spencer*, 439 F.3d at 913); *see also United States v. Turner*, 781 F.3d 374, 386-87 (8th Cir. 2015). Defendant has argued neither with respect to any Rule 41 violations. Having not demonstrated he was prejudiced by any such violations or shown that law enforcement acted with reckless disregard of proper procedure, suppression is not warranted on the basis that the state-issued warrants did not comply with Rule 41.

### 2.  Probable Cause

For the reasons stated below, the Court finds there was a sufficient factual basis establishing the existence of probable cause for each of the Tracking Warrants.

### a.  First & Second Tahoe Tracking Warrants

Defendant contends that the First and Second Tahoe Tracking Warrants suffer

35

from the same defects. Defendant takes issue with the lack of detail provided by the confidential informant regarding the transactions with Kill that the informant observed, the lack of any attempt to have the informant verify that Defendant was in fact the person the informant knew as Kill, and the timing between the observed transactions and the application for the First Tahoe Tracking Warrant.

As stated above, *see supra* Section II.A, the applications in support of the First and Second Tahoe Tracking Warrants explained how law enforcement had been utilizing a confidential informant who had provided reliable information in the past. The applications described how, in February, the confidential informant told law enforcement about an individual known to the informant as Kill who had delivered cocaine to another individual known to the informant on "three occasions in the recent past" and that the informant had been present for these transactions. Def. Ex. 1, ECF No. 41-1 at 3; Def. Ex. 2, ECF No. 41-1 at 11. The confidential informant relayed that Kill was driving a Tahoe with a specified license plate and that Kill was associated with a residence on Third Street North, but did not live there.

The applications explained that, through their investigative efforts, law enforcement learned that "Kill" was a moniker for Defendant; the Third Street North residence was associated with Defendant along with the Bren Road residence; the Tahoe in question was registered to Defendant's wife at the Bren Road residence; and Defendant's criminal history included, among other things, charges related to and one conviction for controlled-substance offenses.

Under the totality of the circumstances, including the confidential informant's

history of providing trustworthy information and corroboration by law enforcement of information connecting the "Kill" moniker to an individual who was also linked to the Tahoe reported to be present during the narcotics transactions, there was a fair probability that evidence of criminal activity would be found and probable cause to support the issuance of the First and Second Tahoe Tracking Warrants. *See Williams*, 10 F.3d at 593. The fact that the three transactions the confidential informant was present for could have occurred "almost a month prior to the application" for the First Tahoe Tracking Warrant, Def. Mem. in Supp. at 19, does not render the information stale. *See United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008).

### b. Traverse Tracking Warrant

With respect to the Traverse Tracking Warrant, Defendant complains that the confidential informant did not have any first-hand knowledge of any narcotics activity or what vehicle Defendant was driving, rather the information relayed to law enforcement was hearsay. Defendant also takes issue with the lack of detail regarding the alleged continuing narcotics activity, asserting there is "no reference to the amount of cocaine being dealt, the location of where cocaine is being dealt, to whom cocaine is being dealt, or when cocaine was being dealt." Def. Mem. in Supp. at 20. And, like the First and Second Tahoe Tracking Warrants, Defendant points out that law enforcement did not have the confidential informant identify him and challenges the overall timing of the events in question.

As detailed above, *see supra* Section II.C, the application in support of the Traverse Tracking Warrant explained how, approximately three months earlier, law

enforcement had obtained warrants to search two residences associated with Defendant, which collectively resulted in the recovery of approximately 10 pounds of cocaine, more than $50,000 in U.S. currency, narcotics packaging, a digital scale, and a money counter. The application went on to explain how, following the execution of these warrants, law enforcement observed Defendant driving a Chevrolet Traverse with a specified license plate that was registered to Defendant's wife.  The application explained how, sometime during the past month, law enforcement was in contact with the confidential informant, who relayed to law enforcement that the informant "learned [Defendant] was out dealing quantities of cocaine again" and "was seen driving a smaller Chevrolet SUV described as being smaller than a Chevrolet Tahoe."  Def. Ex. 5, ECF No. 42.  The application further advised that the confidential informant had been working with law enforcement for eight months and had a history of providing true and accurate information.

The application in support of the Traverse Tracking Warrant discussed how law enforcement's investigatory efforts resulted in learning that Defendant and his wife were no longer residing at the Bren Road residence and were now linked to a residence in Maple Grove.  The application explained how, even though Defendant was not listed on the lease for the Maple Grove residence, law enforcement "learned he ha[d] been observed at the apartment on several occasions" and law enforcement had observed the Traverse in the parking lot of the Maple Grove residence.  The application also discussed Defendant's criminal history, including charges related to and a conviction for controlled-substance crimes as well as a new federal complaint and arrest warrant that had issued in connection with controlled substances.

Again, as stated above, *see supra* Section IV.B.6, the confidential informant need not have personally witnessed Defendant engaged in narcotics transactions or driving the Traverse for this information to contribute to the factual basis supporting the existence of probable cause. *See Jones*, 74 F.4th at 949. And again considering the confidential informant's history of providing trustworthy information and the totality of the circumstances, including the narcotics and other evidence recently seized from Defendant's residences and corroboration by law enforcement of Defendant's connection to the Traverse through information linking the vehicle to Defendant via his wife, law enforcement's own observation of Defendant driving the vehicle, and the vehicle's presence at the Maple Grove residence associated with Defendant and his wife, there was a fair probability that evidence of criminal activity would be found and probable cause existed to support the issuance of the Traverse Tracking Warrant. *See Williams*, 10 F.3d at 593; *see also Jeanetta*, 533 F.3d at 655.

### c. Third Tahoe Tracking Warrant

Zeroing in on law enforcement's use of the word "may," Defendant asserts that law enforcement "did not even think it was probable that . . . [the Third Tahoe Tracking Warrant] would lead to the discovery of contraband or evidence of a crime." Def. Mem. in Supp. at 21; *see* Def. Ex. 6, ECF No. 41-1 at 51 ("[Y]our affiant believes that [Defendant] *may* be utilizing the . . . Tahoe . . . ." (emphasis added)). Defendant argues that law enforcement "was simply making an uncorroborated guess that [he] was driving the Tahoe." Def. Mem. in Supp. at 21. Defendant also reiterates that it was "patently false" that the confidential informant observed him in Minnesota within 72 hours of the

application.  Def. Mem. in Supp. at 21.

Among other things, the application in support of the Third Tahoe Tracking Warrant explained how, approximately three months earlier, law enforcement had obtained warrants to search two residences associated with Defendant, which collectively resulted in the recovery of approximately 10 pounds of cocaine, more than $50,000 in U.S. currency, narcotics packaging, a digital scale, and a money counter.  The application described law enforcement's investigative efforts leading them to the Traverse; the use of a confidential informant who had a history of providing reliable information; and Defendant's criminal history, including the recent federal complaint and arrest warrant.

The application in support of the Third Tahoe Tracking Warrant went on to explain how electronic surveillance of the Traverse led to the vehicle being located in the airport parking ramp; law enforcement learned that Defendant had purchased a one-way ticket to Florida; and, at the time of the application, the vehicle remained in the airport parking ramp.  The application then discussed the confidential informant's most recent information: within the past 72 hours, the informant had observed Defendant in Minnesota and he had a quantity of cocaine for sale.  The application candidly stated that neither the confidential informant nor law enforcement knew what vehicle Defendant was driving.

Next, as stated above, *see supra* Section IV.B.5, the application went on to explain why—notwithstanding the fact that the Traverse remained parked at the airport since Defendant departed for Florida—law enforcement believed that Defendant may have returned to Minnesota and was driving the Tahoe.  The application noted how law

40

enforcement had conducted previous electronic surveillance of the Tahoe, a vehicle registered to Defendant's wife and known by law enforcement to be used by Defendant. The application described how apartment staff at the Maple Grove residence associated with Defendant and his wife advised law enforcement that there was a parking space associated with the residence and noticed that Defendant's wife and kids could be heard in the residence even when the Tahoe was not on the premises.

Based on the information supplied by Defendant, it appears that the confidential informant may have been mistaken. Yet, as previously stated, Defendant has not shown that law enforcement knew or should have known the confidential informant was mistaken. Here too, with due consideration to the confidential informant's history of providing trustworthy information and the totality of the circumstances, including the narcotics and other evidence recently seized from Defendant's residences, the known connection between Defendant and the Tahoe, and reasonable inferences based on the information obtained from apartment staff—namely, that Defendant used his wife's vehicle and such use may well explain why the Traverse remained at the airport parking ramp but Defendant appeared to be in Minnesota, there was a fair probability that evidence of criminal activity would be found and probable cause existed to support the issuance of the Third Tahoe Tracking Warrant. *See Williams*, 10 F.3d at 593; *see also Gates*, 462 U.S. at 238; *James*, 3 F.4th at 1104; *Anderson*, 339 F.3d at 723.

### B. Residence Warrants

As to the Residence Warrants, Defendant asserts that the canine sniffs utilized were warrantless searches and therefore unconstitutional and the Residence Warrants

were not supported by probable cause and stale at the time of execution.

### 1. Canine Sniffs

Relying on *Florida v. Jardines*, 569 U.S. 1 (2013), and *United States v. Whitaker*, 820 F.3d 849 (7th Cir. 2016), Defendant argues that the canine sniffs at the Portland Avenue and Bren Road residences constituted a warrantless search.[10]

In *Jardines*, the Supreme Court held that "a drug dog sniff on the front porch of a house is an unlawful intrusion on the curtilage of a home." *United States v. Perez*, 46 F.4th 691, 697 (8th Cir. 2022) (citing 569 U.S. at 6-7); *see also United States v. Hines*, 62 F.4th 1087, 1092 (8th Cir. 2023). Relying on the concurrence in *Jardines* and utilizing a privacy (as opposed to property) analysis, the Seventh Circuit Court of Appeals held in *Whitaker* that "a warrantless search within the meaning of the Fourth Amendment" took place when law enforcement "had a drug-sniffing dog come to the door of the apartment and search for the scent of illegal drugs." 820 F.3d at 854.

"It is well-settled that there exists no generalized expectation of privacy in the common areas of an apartment building." *United States v. Brooks*, 645 F.3d 971, 976 (8th Cir. 2011) (quotation omitted); *see, e.g.*, *United States v. White*, No. 22-cr-207 (JRT/ECW), 2023 WL 5558838, at *6 (D. Minn. Aug. 29, 2023) [hereinafter *White II*] ("White's arguments fail because the hallway outside Apartment 1515 is not a constitutionally protected area."). Defendant makes no arguments as to why the common hallways of the Portland Avenue and Bren Road residences equate to the curtilage of a home. *Contra Jardines*, 569 U.S. at 6-7; *cf. United States v. Hopkins*, 824 F.3d 426, 731-

---

[10] *Cf. supra* Section IV.B.4.

33 (8th Cir. 2016); *United States v. Burston*, 806 F.3d 1123, 1126-28 (8th Cir. 2015).

In *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010), the Eighth Circuit held that a canine sniff "of the apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment."   *Scott* also rejected equating canine sniffs with the "sense-enhancing technology" in *Kyllo v. United States*, 533 U.S. 27 (2001), whereas the Seventh Circuit reached the opposite conclusion in *Whitaker*. *Compare Scott*, 610 F.3d at 1016, *with Whitaker*, 820 F.3d at 852-53; *see United States v. Navarrete-Rivera*, No. 22-cr-0052 (DWF/JFD), 2022 WL 18587736, at *6 (D. Minn. Nov. 21, 2022) [hereinafter *Navarrete-Rivera I*] ("Justice Kagan would have decided *Jardines* on privacy interests, as well as property interests, and that is exactly what the Seventh Circuit did in *Whitaker*." (citation omitted)), *report and recommendation adopted,* 2023 WL 142806 (D. Minn. Jan. 10, 2023) [hereinafter *Navarrete-Rivera II*].

True, *Scott* was decided before *Jardines*.  *See Perez*, 46 F.4th at 697; *see also Hines*, 62 F.4th at 1092.  But, "*Jardines* did not speak to the constitutionality of a canine sniff in a common hallway outside an apartment."  *United States v. White*, No. 22-cr-207 (JRT/ECW), 2023 WL 5753678, at *13 (D. Minn. June 5, 2023) [hereinafter *White I*], *report and recommendation adopted*, *White II*, 2023 WL 5558838 (D. Minn. Aug. 29, 2023).  And, as two cases in this District have observed, "*Scott* is still the law in this Circuit, and under *Scott*, a dog sniff of an exterior apartment door opening into a common hallway is constitutional."  *Navarrete-Rivera I*, 2022 WL 18587736, at *6; *see also White I*, 2023 WL 5753678, at *13.  "*Jardines* did not overrule *Scott*, nor could it, because *Jardines'* holding is premised on a property-rights analysis, and apartment tenants do not

have a property interest in the common hallway outside their door." *Navarrete-Rivera*, 2022 WL 18587736, at *6.  Because "*Scott* remains the law of the Eighth Circuit and *Jardines* did not speak to the constitutionality of a canine sniff in a common hallway outside an apartment," the Court concludes that the canine sniffs occurring in the common hallways of the Portland Avenue and Bren Road residences did not constitute a warrantless search in violation of the Fourth Amendment. *See Scott*, 610 F.3d at 1016; *White II*, 2023 WL 5558838, at *6-7; *White I*, 2023 WL 5753678, at *13; *Navarrete-Rivera II*, 2023 WL 142806, at *2; *Navarrete-Rivera I*, 2022 WL 18587736, at *5-6.

Nor did the applications in support of the Portland Avenue and Bren Road Warrants need to provide more information regarding Molly.  "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999); *accord Navarrete-Rivera I*, 2022 WL 18587736, at *5.  "An affidavit need not give a detailed account of the dog's track record or education." *Sundby*, 186 F.3d at 876; *accord Navarrete-Rivera I*, 2022 WL 18587736, at *5.  Each application stated that Molly was certified in narcotics detection and undergoes ongoing weekly training.  Def. Ex. 3, ECF No. 41-1 at 20-21; Def. Ex. 4, ECF No. 41-1 at 32-33.

Lastly, to the extent Defendant challenges the "veracity of the statements contained in the affidavit[s] regarding Molly's search of the hallways of [the Portland Avenue and Bred Road residences]," this is more akin to a *Franks* challenge and merely alleging that it is possible "Molly could have done [something] during the sniff to invalidate it" is not sufficient.  Def. Mem. in Supp. at 34; *see Mayweather*, 993 F.3d at

44

1043.

### 2. Probable Cause

The Court has already concluded that the challenged canine sniffs were not necessary to a finding of probable cause and there remained a substantial basis for concluding there was a fair probability that narcotics or evidence of criminal activity would be found at the Portland Avenue and Bren Road residences without them in the context of Defendant's motion for a *Franks* hearing. *See supra* Section IV.B.4. For those same reasons, the Court similarly concludes the Residence Warrants were supported by probable cause regardless of the canine sniffs and suppression is not warranted. Moreover, while Defendant asserts that staff suspicions of "criminal activity because they noted people coming and going and staying for only short periods of time" at the Portland Avenue residence make inappropriate assumptions about Defendant "based upon his race and appearance" and "should be ignored," Def. Mem. in Supp. at 25-26, the Eighth Circuit has considered such third-party observations as part of the probable-cause calculus. *See United States v. Sumpter*, 669 F.2d 1215, 1220-22 (8th Cir. 1982) (considering letter from neighbor regarding "a large amount of short term traffic" at the residence and garbage collectors' report that occupants of three cars stopped, entered, and left the residence "in a very short time").

### 3. Staleness at Execution

Defendant asserts that the Residence Warrants were stale at the time of execution because they were executed seven days after application. Def. Mem. in Supp. at 27 ("*seven-day* delay" between issuance and application (emphasis in original)). According

45

to Defendant, the confidential informant only provided information regarding alleged narcotics sales that took place in February and there was "no *recent* information of Defendant's alleged cocaine sales." Def. Mem. in Supp. at 29 (emphasis in original). Defendant asserts "there was no basis whatsoever to conclude that [he] was involved in the ongoing sale of narcotics" at the time the Residence Warrants were executed. Def. Mem in Supp. at 30.

"The Fourth Amendment requires police to execute a search warrant within a reasonable time after its issuance." *United States v. Leick*, 944 F.3d 1017, 1019 (8th Cir. 2019). "Reasonableness should be measured in terms of whether probable cause still existed at the time the warrant was executed." *Id.*; *see United States v. Ortiz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) ("A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." (quotation omitted)). "Whether the period of delay between issuance and execution of a warrant is reasonable necessarily depends upon the facts and circumstances of each case." *Williams*, 10 F.3d at 594. "Factors to be considered in determining whether probable cause has dissipated include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." *Leick*, 944 F.3d at 1019 (quotation omitted).

Notably, the Residence Warrants were executed well "within the allowable range for execution specified by Minnesota and federal law." *United States v. Tenerelli*, 614 F.3d 764, 770 (8th Cir. 2010); *see* Fed. R. Crim. P. 41(e)(2)(A)(i) (14 days); Minn. Stat.

§ 626.15(a) (10 days).   The Eighth Circuit has held upheld search warrants related to controlled-substance crimes executed six and eight days later.   *See, e.g.*, *Tenerelli*, 614 F.3d at 770-71 (6 days); *Williams*, 10 F.3d at 594-95 (8 days); *United States v. Shegog*, 787 F.2d 420, 422-23 (8th Cir. 1986) (8 days).   Moreover, "[i]n investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant do not necessarily make the information stale," *Ortiz-Cervantes*, 868 F.3d at 700 (quotation omitted), and a lapse in time is less important when the activity is ongoing, *see, e.g.*, *Tenerelli*, 614 F.3d 770 ("The ongoing nature of methamphetamine distribution also supports the continued existence of probable cause."); *Williams*, 10 F.3d at 595 ("[T]he continuing and ongoing nature of cocaine trafficking supports the continued existence of probable cause.").

As described in the applications in support of the Residence Warrants, law enforcement received information from the confidential informant in February regarding Defendant's alleged involvement in the distribution of cocaine and the three transactions "in the recent past."   Def. Ex. 3, 41-1 at 19; Def. Ex. 4, 41-1 at 31.   This information was reported roughly two to three months prior to the applications.[11]   Each application went on to explain, however, that law enforcement had "maintained regular communication on a weekly basis with the [confidential informant]" and the informant had advised that "sources known to the [informant] continue to communicate with 'Kill' (believed to be [Defendant]) about ongoing narcotics transactions specific to the sale of cocaine."   Def. Ex. 3, ECF No. 41-1 at 20; Def. Ex. 4, ECF No. 41-1 at 32.   Thus, there *was* recent

---

[11] The applications are both dated April 27, 2023.   Def. Ex. 3, ECF No. 41-1 at 24; Def. Ex. 4, ECF No. 41-1 at 35.

information regarding Defendant's alleged narcotics activity and the ongoing nature of such activity.  Further, with respect to the Portland Avenue Warrant, law enforcement had recently spoken with apartment staff who "suspected criminal activity related to narcotics trafficking occurring in the [Portland Avenue residence]" because "people [were] coming and going, staying for only short periods of time."  Def. Ex. 4, ECF No. 41-1 at 32.  It was reasonable for law enforcement to conclude that narcotics or evidence of criminal activity would be found at the Portland Avenue and Bren Road residences at the time the Residence Warrants were executed,[12] and the warrants were not stale.  *See Tenerelli*, 614 F.3d 770; *Williams*, 10 F.3d at 595.

### C. Storage Unit Warrant

Like the Residence Warrants, Defendant asserts the canine sniff of the storage unit was a warrantless search and therefore unconstitutional and the Storage Unit Warrant was not supported by probable cause.

#### 1. Canine Sniff

The storage unit was neither a house nor an apartment.  *Contra Jardines*, 569 U.S. at 6; *Whitaker*, 820 F.3d at 851.  And, under *Scott*, Buck's sniff of the exterior of the storage unit did not constitute a search.  *See* 610 F.3d at 1015-16; *see also, e.g.*, *United States v. McKenzie*, 13 F.4th 223, 231-35 (2d Cir. 2021) (refusing to extend *Jardines* to canine sniff of storage unit and finding no property or privacy basis upon which to conclude sniff of unit's exterior constituted a search); *United States v. Lucas*, 338 F.

---

[12] Again, within the context of having previously determined that the canine sniffs were not necessary to a finding of probable cause, the Court has not considered them here.

Supp. 3d 139, 165 (W.D. N.Y. 2018) (finding "the principles of *Jardines* do not extend to the common area outside a storage locker at a commercial establishment" and defendant had no "reasonable expectation of privacy in the common area outside the storage locker"); *cf. United States v. Martinez*, No. 22-cr-86 (PJS/BRT), 2022 WL 18051880, at *10 (D. Minn. Nov. 16, 2022) ("Lemoine may have a reasonable expectation of privacy in the rented storage units and the contents inside those units, but he does not have an expectation of privacy in particles of contraband floating outside the storage units where law enforcement are permitted to be, just as the Supreme Court has held that one does not have an expectation of privacy in the scent of contraband. An ion swab on the exterior of a storage unit door that is not only located in an open-air lot but is accessible to all others who staff allow in, is not like the search of the curtilage of a home, but is more akin to a dog sniff on the outside of a storage unit." (citations omitted)), *report and recommendation adopted*, 2022 WL 18011789 (D. Minn. Dec. 30, 2022).

### 2. Probable Cause

Defendant asserts that the Storage Unit Warrant was not supported by probable cause because it was based on information obtained from searches authorized under the other warrants, which he contends were unlawful, and the information from the confidential informant was stale, lacked, sufficient detail, and did not connect Defendant to the storage unit.

The Court has already concluded that the searches conducted pursuant the various tracking warrants (First, Second, and Third Tahoe Tracking Warrants and the Traverse Tracking Warrant) as well as the Residence Warrants were lawful. The Court has also

repeatedly addressed how it is permissible to rely on information provided by a confidential informant who has provided trustworthy information in the past. Here, while the confidential informant's information played a role in telling the overall investigative story into Defendant's alleged narcotics activities, the application in support of the Storage Unit Warrant was fundamentally based on the investigative efforts of law enforcement and the information those efforts uncovered linking Defendant to the storage unit.

Among other things, the application in support of the Storage Unit Warrant explained how, approximately five months earlier, law enforcement had obtained warrants to search two residences associated with Defendant, which collectively resulted in the recovery of approximately 10 pounds of cocaine, more than $50,000 in U.S. currency, narcotics packaging, a digital scale, and a money counter. The application described law enforcement's investigative efforts leading them to the Traverse, including information from a confidential informant who had a history of providing reliable information that Defendant was again dealing cocaine and driving a smaller Chevrolet SUV, and Defendant's criminal history, including the recent federal complaint and arrest warrant. The application then explained how, approximately one month earlier, in early September, Defendant was arrested while in the Traverse and "[a] search of the vehicle resulted in the recovery of a large quantity of U.S. currency located in the center console," "bound by rubber bands and . . . in multiple stacks of varying denomination consistent with [law enforcement's] training and experience of persons involved in narcotics distribution." Def. Ex. 7, ECF No. 41-1 at 60. The application further

explained that law enforcement "located two hex style key box keys"; law enforcement knew through prior electronic surveillance that Defendant accessed the storage facility; the key style matched the style of keys at the facility; and an administrative subpoena revealed that Defendant had rented a particular storage unit at the facility. Lastly, the application explained how a sniff by a certified narcotics canine at the door of that storage unit resulted in a positive alert.

The electronic surveillance connecting Defendant with the storage facility; the discovery of keys on Defendant at the time of his arrest with the same hex style as the facility's keys; and the records of Defendant having rented a storage unit at the facility established a sufficient nexus between Defendant and the storage unit. Under the totality of the circumstances, including but not limited to the contraband and other items recovered from Defendant's residences and at the time of his arrest as well as the positive canine alert, there was a fair probability that narcotics or evidence of criminal activity would be found in the storage unit. Accordingly, the Storage Unit Warrant was supported by probable cause.

### D. Suppression Not Warranted

For the reasons stated above, the Court recommends that Defendant's motion to suppress be denied.[13]

---

[13] Because the Court concludes that the warrants in question were supported by probable cause, the Court need not address the good-faith exception under *United States v. Leon*, 468 U.S. 897 (1984). *See, e.g.*, *Mayweather*, 993 F.3d at 1041 ("Under the *Leon* good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." (quotation omitted)).

## VI. DEFENDANT'S MOTION TO IDENTIFY INFORMANT(S)

Defendant moves for an order directing the Government to disclose the identity of the confidential informant. *See generally* ECF No. 39. In the alternative, Defendant requests that the Court conduct an *in camera* interview of the confidential informant.

"In *Roviaro v. United States*, the Supreme Court recognized the government's privilege to withhold the identity of a confidential informant." *United States v. Alcantar*, 271 F.3d 731, 739 (8th Cir. 2001) (citing 353 U.S. 53, 59 (1957)); *see also United States v. Oliver*, 950 F.3d 556, 562 (8th Cir. 2020). In determining whether disclosure of an informant's identity is required, "the threshold issue is whether the informant is a material witness." *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001); *see United States v. Barnes*, 486 F.2d 776, 778 (8th Cir. 1973) ("Certainly one of the most relevant factors to be weighed by the court is whether or not the evidence is *material* to the accused's defense or a fair determination of the case." (footnote omitted)).

"Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense." *Devose v. Norris*, 53 F.3d 201, 206 (8th Cir. 1995) (footnote omitted); *see also Barnes*, 486 F.2d at 778-79. "In cases involving 'tipsters' who merely convey information to the government but neither witness nor participate in the offense, disclosure is generally not material to the outcome of the case and is therefore not required." *United States v. Harrington*, 951 F.2d 876, 878 (8th Cir. 1991) (citing *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987)); *accord United States v. Lapsley*, 334 F.3d 762, 764 (8th Cir. 2003) ("Consequently, disclosure is typically not required when the informant merely conveys

information to the government but neither witnesses nor participates in the offense." (quotations omitted)); *Alcantar*, 271 F.3d at 739 (government had no obligation to reveal informant's identity where informant did not participate in crime charged or testify at trial).

Defendant bears the burden of showing beyond mere speculation that disclosure of the informant will be material and helpful to his case. *United States v. Roberson*, 439 F.3d 934, 940 (8th Cir. 2006); *Alcantar*, 271 F.3d at 739; *see also Oliver*, 950 F.3d at 562. "If a trial court orders disclosure absent a showing of materiality, it abuses its discretion." *United States v. Bias*, No. 17-cr-318(06) (SRN/FLN), 2018 WL 3336770, at *2 (D. Minn. July 6, 2018).

Defendant first asserts that information regarding the confidential informant's circumstances is needed to establish the reliability of the informant. The Court has already explained why such information was not necessary to a finding a probable cause. *See supra* Section IV.B.1. Defendant has not shown that information regarding the confidential informant's circumstances is material and his speculation is "not enough to compel disclosure or *in camera* review." *United States v. Mazzulla*, 932 F.3d 1091, 1100 (8th Cir. 2019); *see Oliver*, 950 F.3d at 563; *see also United States v. Chevre*, 146 F.3d 622, 623-24 (8th Cir. 1998).

Defendant next asserts that "it is clear . . . based on the [confidential informant's] allegation [the informant] participated in the crimes that [Defendant] is accused of and a potential material witness that is necessary for trial." Def. Mem. in Supp. at 35. The Government responds that the confidential informant was a tipster, "supply[ing]

information that helped provide probable cause to search [Defendant's] apartment, stash pad, and temporary storage unit." Gov't Resp. at 38. The Government states that "[t]he charges in this case relate to the cocaine seized during those searches" and, as a result, the informant was neither a witness to nor a participant in the charged offenses. Gov't Resp. at 38.

Defendant's charges—two counts of possession with intent to distribute cocaine—relate to conduct occurring in or around May and October 2023. *See generally* ECF No. 20. Defendant is not charged in connection with the three transactions the confidential informant reported to law enforcement in February 2023. Thus, the confidential informant is not an active participant in or witness to the offenses charged. Nor has Defendant shown the materiality of the confidential informant's testimony. *See Harrington*, 951 F.2d at 877-78; *United States v. Grisham*, 748 F.2d 460, 463-64 (8th Cir. 1984).

Defendant's request that the Government disclose the identity of the confidential informant or, in the alternative, that the Court conduct an *in camera* interview, is denied. *See Oliver*, 950 F.3d at 563 ("[M]ere speculation that undisclosed information is material is not enough to compel *in camera* review." (quotation omitted)).

## VII. DEFENDANT'S MOTION FOR DISCOVERY

Defendant moves for an order directing the Government "to produce ALL outstanding discovery and *Brady*/*Giglio* materials." ECF No. 40 at 1; *see generally* ECF No. 40. Defendant asserts that he has twice requested that the Government produce certain data ("GPS Tracking Data and Cell Phone Dump Data") and the Government has

confirmed possession of the data and agreed to produce it, but he still has not received the data.  Def. Mem. in Supp. at 37.  Defendant also seeks disclosure of all materials under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  At the hearing, Defendant confirmed that the data requested had since been produced.  Defendant also orally moved for the production of all reports between January and June 2023 prepared by the investigator serving as Molly's handler for purposes of determining whether the investigator was on duty at the time of the canine sniffs at the Portland Avenue and Bren Road residences.

The Government states that it has and will continue to comply fully with its obligations under *Brady* and *Giglio*.  The Government objects to Defendant's motion to the extent he seeks discovery beyond those obligations and to Defendant's request for reports prepared by Molly's handler.

"[T]he Due Process Clause of the Fifth Amendment requires the government to disclose to the accused favorable evidence that is material to guilt or punishment." *United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019) (citing *Brady*, 373 U.S. at 87); *see also* Fed. R. Crim. P. 5(f).  "Under *Brady* and its progeny, prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence."  *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016); *accord United States v. Wright*, 866 F.3d 899, 908 (8th Cir. 2017); *see United States v. Whitehill*, 532 F.3d 746, 753 (8th Cir. 2008) ("*Brady* applies to exculpatory and impeachment evidence, whether or not the accused has specifically requested the information." (citations omitted)).  "The [Supreme] Court has extended

*Brady* protection to witness-credibility evidence when the reliability of the witness 'may well be determinative of guilt or innocence.'" *United States v. Sigillito*, 759 F.3d 913, 930 (8th Cir. 2014) (quoting *Giglio*, 405 U.S. at 154); *accord Dones-Vargas*, 936 F.3d at 722; *see United States v. Primm*, 63 F.4th 1186, 1192 (8th Cir. 2023). "One reason for this extension to witness-credibility evidence is because exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Sigillito*, 759 F.3d at 930 (quotation omitted). The Eighth Circuit "ha[s] determined that witness motivations, like the payment of money as an incentive to change testimony, fall within the *Brady* disclosure requirement." *Id.* (citing *United States v. Librach*, 520 F.2d 550, 554 (8th Cir. 1975)). "Furthermore, the prosecutor must disclose the possibility of a reward that gives the witness a personal stake in the defendant's conviction." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 683 (1985)).

At the same time, "[c]riminal defendants do not have a general constitutional right to discovery." *United States v. Johnson*, 228 F.3d 920, 924 (8th Cir. 2000); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). "[T]he Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. 622, 629 (2002). "In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government." *Johnson*, 228 F.3d at 924.

Defendant's motion is granted in part to the extent that the Government shall comply fully with its obligations under *Brady*, *Giglio*, and their progeny and disclose all

exculpatory and impeachment evidence as well as Jencks Act, 18 U.S.C. § 3500, and Federal Rule of Criminal Procedure 26.2 materials.  *See Mazzulla*, 932 F.3d at 1100.  If the Government subsequently discovers additional exculpatory or impeachment evidence, it shall disclose such evidence as soon as practicable after such discovery.  Defendant has not provided any authority in support of his request for the reports of Molly's handler.[14] To the extent Defendant seeks discovery and disclosures outside the Government's obligations, including the production of reports from Molly's handler, or seeks materials that have already been produced, his motion and oral motion are denied.  *See Johnson*, 228 F.3d at 924.

## VIII. ORDER

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Government's Motion for Discovery Pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, 12.3, and 26.2, ECF No. 27, is **GRANTED**.

2. Defendant's Motion for a "*Franks*" Hearing, ECF No. 37, is **DENIED**.

3. Defendant's Motion to Identify Confidential Informant(s), ECF No. 39, is **DENIED**.

4. Defendant's Motion for Discovery and *Brady*/*Giglio* Materials, ECF No. 40, is **GRANTED IN PART** and **DENIED IN PART**.

5. Defendant's oral motion for the production of all reports between January and June 2023 prepared by the investigator serving as Molly's handler is **DENIED**.

---

[14] That the issue of the reports may not have come up until after Molly's training/deployment log was produced, which occurred after Defendant's pretrial motions were filed, does not change the fact that Defendant did not supply any authority in support of his oral motion at the hearing.

## IX. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion for Suppression of Evidence, ECF No. 38, be **DENIED**.


Date: March___15___, 2024                          *s/Tony N. Leung*
                                                   Tony N. Leung
                                                   United States Magistrate Judge
                                                   District of Minnesota

                                                   *United States v. Cage*
                                                   Case No. 23-cr-334 (MJD/TNL)


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.